Matthew J. Langley (SBN 342846)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Ph: (312) 576-3024
Email: matt@almeidalawgroup.com

Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd Suite 426
Long Beach, California 90802
Ph: (562) 534-5907
Email: victor@almeidalawgroup.com

*Counsel for the Plaintiffs and the Proposed Class*

*[additional counsel listed on signature page]*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| HEIDI FENTON, LIZ ELDRIDGE, and BOBBYJO ANDOH, *on behalf of themselves and all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>THE BIRD AND BE CO., INC.,<br><br>Defendant. | Case No.<br><br>**PLAINTIFFS' CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>1. Violations of 18 U.S.C. § 2511(1), et seq.;<br>2. Violations of Cal. Penal Code § 631;<br>3. Violations of Cal. Penal Code § 632;<br>4. Violations of Cal. Penal Code § 638.51(a);<br>5. Violations of Cal. Civ. Code §§ 56, et seq.;<br>6. Violations California Constitution Art. 1 § 1;<br>7. Common Law Invasion of |

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

1

Privacy – Intrusion Upon Seclusion;
8. Negligence; and
9. Unjust Enrichment.

**<u>DEMAND FOR JURY TRIAL</u>**

CASE NO.:

2

Plaintiffs Heidi Fenton, Liz Eldridge and BobbyJo Andoh (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Defendant The Bird and Be Co., Inc. ("Bird&Be" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## INTRODUCTION

1.  Information concerning an individual's health, including and especially information regarding fertility and women's reproductive health, is among the most sensitive, and closely guarded information in our society.

2.  Fertility treatment can be a difficult journey—both physically and emotionally.  One in eight couples has trouble getting pregnant or carrying a pregnancy, and 7.4 million women have received infertility treatment.  Despite the prevalence of infertility, information concerning fertility and reproductive health is among the most confidential and sensitive information in our society. According to a recent study, most infertile women choose to keep their struggle private from family or friends.

3.  Regarding the need to keep information about reproductive health private, the Department of Health and Human Services ("HHS") has noted:

> A positive, trusting relationship between individuals and their health care providers is essential to an individual's health and well-being. The prospect of releasing highly sensitive PHI can result in medical mistrust and the deterioration of the confidential, safe environment that is necessary to quality health care, a functional health care system, and the public's health generally. That is even more true in the context of reproductive health care, given the potential for stigmatization and other adverse consequences to individuals resulting from disclosures they do not want or expect.

4.  The mishandling of such private and sensitive health information can have serious consequences including, but certainly not limited to, discrimination in

CASE NO.:

3

PLAINTIFFS'
CLASS ACTION COMPLAINT

the workplace and/or denial of insurance coverage. Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical and fertility treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

5.      Bird&Be sells fertility testing kits and supplements aimed towards women trying to conceive.[1]  Through Bird&Be's website – www.birdandbe.com – (the "Website"), patients can purchase Bird&Be's products or take Bird&Be's online health assessment to receive recommendations about which of its products are best suited for their needs.

6.      Unfortunately, unbeknownst to Plaintiffs and other visitors to Defendant's website, Bird&Be does not protect the confidentiality of its patients' confidential health information. Instead, through Bird&Be's website, Defendant collected and transmitted personally identifiable, sensitive health information pertaining to Plaintiffs and other Bird&Be customers, including their full names, e-mail addresses, their biological sex, their partner's biological sex, the diagnoses made by its online assessment, and the specific products that they purchased (collectively, the "Sensitive Health Information") to unauthorized third parties, including Alphabet, Inc. ("Google"), Meta Platforms, Inc. ("Facebook") and Klaviyo, through its use of surreptitious online tracking tools.

7.      Online advertising giants, like Google and Facebook, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured by those

---

[1] *About Us*, BIRD&BE, https://birdandbe.com/pages/about-us (last accessed Dec. 9, 2025); *Shop*, PROOV, https://proovtest.com/collections/shop-all (last accessed Dec. 9, 2025).

CASE NO.:                                                    PLAINTIFFS'
                                       4                     CLASS ACTION COMPLAINT

online behemoths can be used to stream ads to that person. If Google or Facebook receives information that a person is suffering from fertility issues, they will use that information, and allow their clients to use that information, to stream ads to that person's computers and smartphones for products and services related to fertility treatment.

8. Google and Facebook offer website operators access to their proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, Google Tag Manager, Meta Business Suite, and Facebook Ads (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google and Facebook's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

9. But, in exchange for access to these Business Tools, website operators install Google and Facebook's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google and Facebook use to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

10. In essence, when website operators use Google and Facebook's Business Tools, they choose to participate in Google and Facebook's mass surveillance network and, in turn, benefit from Google and Facebook's collection of user data at the expense of their customers' privacy.

CASE NO.:

5

PLAINTIFFS'
CLASS ACTION COMPLAINT

11.     Bird&Be is one of the many companies that has chosen to prioritize its marketing efforts over its customers' privacy, by installing Tracking Tools on its website.

12.     Plaintiffs and Class Members visited the Website and had their personal Sensitive Health Information tracked by Defendant using the Tracking Tools.  However, Defendant ***never*** obtained authorization from Plaintiffs or Class Members to share their Sensitive Health Information with third parties. At all times relevant to this action, Plaintiffs and Class Members gave no informed consent for information about their Sensitive Health Information to be transmitted to the third parties, including the largest advertiser and compiler of user information, or the largest social media company on earth, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue.[2]

13.     As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with online service providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (viii) continued and ongoing risk to their Sensitive Health Information.

14.     Therefore, Plaintiffs seek on behalf of themselves and a class of similarly situated persons, to remedy these harms and asserts the following statutory and common law claims against Defendant: Invasion of Privacy; Breach of Confidence; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; and violations of the Electronic Communications Privacy Act.

---

[2] This Court will not have to look far to find evidence of Meta's violations of privacy laws. Just in May of this year the European Union fined Meta "a record-breaking" $1.3 billion for violating EU privacy laws. *See* Hanna Ziady, *Meta slapped with record $1.3 billion EU fine over data privacy*, https://www.cnn.com/2023/05/22/tech/meta-facebook-data-privacy-eu-fine/index.html (last accessed Dec. 9, 2025).

CASE NO.:                                          PLAINTIFFS'
                                  6                CLASS ACTION COMPLAINT

## PARTIES

***Plaintiff Heidi Fenton***

15. Plaintiff Fenton is a citizen of the State of Pennsylvania, residing in Dauphin County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

16. In or around November of 2024, Plaintiff Fenton utilized Defendant's Website on her personal electronic devices to take its online fertility assessment and consequently had her Sensitive Health Information tracked and disclosed, in the same manner as depicted in Sec. IV(A)(d), *infra*, including her full name, her e-mail addresses, her biological sex, her partner's biological sex, and the specific ovarian and uterine medical diagnoses made by Defendant's online assessment tool.

17. Unbeknownst to Plaintiff Fenton, the Defendant transmitted the Sensitive Health Information that she communicated while using the Website. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which was disclosed to third parties including Google, were that Plaintiff Fenton 1) was having medical issues concerning her fertility; 2) that Plaintiff Fenton was seeking treatment for fertility issues; and 3) the medical diagnosis regarding Plaintiff Fenton's ovarian and uterine medical conditions. As a result of Plaintiff Fenton's use of the Website, Defendant disclosed to third parties including Google, the information she shared with Defendant through the Website. Defendant also disclosed to third parties Plaintiff Fenton's PII, including the disclosure of her CID to Google.

18. Plaintiff Fenton never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties, including the Sensitive Health Information that she provided to Defendant.

19. On every occasion that she visited Defendant's Website, Plaintiff Fenton possessed accounts with Google and Facebook, and she accessed

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

Defendant's Website while logged into her Google and Facebook accounts on the same device.

### *Plaintiff BobbyJo Andoh*

20. Plaintiff Andoh is a citizen of the State of Maryland, residing in Frederick County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

21. In or around October of 2025, Plaintiff Andoh utilized Defendant's Website on her personal electronic devices to take its online fertility assessment and consequently had her Sensitive Health Information tracked and disclosed, in the same manner as depicted in Sec. IV(A)(d), *infra*, including her full name, her e-mail addresses, her biological sex, her partner's biological sex, and the specific ovarian and uterine medical diagnoses made by Defendant's online assessment tool.

22. Unbeknownst to Plaintiff Andoh, the Defendant transmitted the Sensitive Health Information that she communicated while using the Website. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which were disclosed to third parties including Google, were that Plaintiff Fenton 1) was having medical issues concerning her fertility; 2) that Plaintiff Fenton was seeking treatment for fertility issues; and 3) the medical diagnosis regarding Plaintiff Andoh's ovarian and uterine medical conditions. As a result of Plaintiff Andoh's use of the Website, Defendant disclosed to third parties including Google, the information she shared with Defendant through the Website. Defendant also disclosed to third parties Plaintiff Andoh's PII, including the disclosure of her CID to Google.

23. Plaintiff Andoh never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties, including the Sensitive Health Information that she provided to Defendant.

24. On every occasion that she visited Defendant's Website, Plaintiff Andoh possessed accounts with Google and Facebook, and she accessed

CASE NO.:                                                    PLAINTIFFS'
                                          8          CLASS ACTION COMPLAINT

Defendant's Website while logged into her Google and Facebook accounts on the same device.

*Plaintiff Liz Eldridge*

25.    Plaintiff Eldridge is a citizen of the State of California, residing in Los Angeles County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

26.    In or around December of 2025, Plaintiff Eldridge utilized Defendant's Website on her personal electronic devices to purchase fertility products to treat her fertility issues. When she did, Defendant disclosed to third parties, including Google, the specific fertility products she searched for and chose as well as the fact that she took a step towards purchasing those products by proceeding to the check-out page.

27.    Unbeknownst to Plaintiff Eldridge, the Defendant transmitted the Sensitive Health Information that she communicated while using the Website. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which were disclosed to third parties including Google, were: 1) that Plaintiff Eldridge was having medical issues concerning her fertility; 2) that Plaintiff Eldridge was seeking treatment for fertility issues; and 3) that Plaintiff Eldridge purchased products from Defendant to treat her fertility issues. As a result of Plaintiff Eldridge's use of the Website, Defendant disclosed to third parties including Google, the information she shared with Defendant through the Website. Defendant also disclosed to third parties Plaintiff Eldridge's PII, including the disclosure of her CID to Google.

28.    Plaintiff Eldridge never authorized Defendant to disclose any aspect of her communications with Defendant through its Website to third parties, including the Sensitive Health Information that she provided to Defendant.

CASE NO.:

9

PLAINTIFFS'
CLASS ACTION COMPLAINT

29.    On every occasion that she visited Defendant's Website, Plaintiff Eldridge possessed accounts with Google and Facebook, and she accessed Defendant's Website while logged into her Google and Facebook accounts on the same device.

***Defendant Bird&Be***

30.    Defendant The Bird and Be Co., Inc. is a business corporation incorporated in Toronto, Ontario, Canada, with its principal place of business at 100 King Street West Ste 2600 1, Toronto, Ontario, M5X 1B8, Canada.

## **JURISDICTION AND VENUE**

31.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

32.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*).

33.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein from part of the same case or controversy.

34.    This Court has personal jurisdiction over Defendant because Defendant, a company incorporated and headquartered in Canada, is not subject to jurisdiction in any state's court of general jurisdiction. Personal jurisdiction is also proper because Defendant has advertised and offered its Website to consumers in the State of California and in this judicial district, and has otherwise made or established contacts in the State of California and in this judicial district sufficient to permit the exercise of personal jurisdiction.  Among these contacts is Defendant

CASE NO.:                                                     PLAINTIFFS'
                                            10          CLASS ACTION COMPLAINT

mailing products ordered by consumers to their California addresses and Defendant's privacy policy which specifically addresses the privacy rights of California citizens.[3]

35.     Venue is proper in this District under 28 U.S.C. § 1391(a)- (d) because: a substantial part of the events giving rise to this action occurred in this District, including because Defendant collects and redistributes Class Members' Sensitive Health Information in this District; and Defendant caused harm to Class Members residing in this District.

**FACTUAL ALLEGATIONS**

**I. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES**

    **A.    Google and Facebook's Mass Advertising Surveillance Operation**

36.     Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[4] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[5]

37.     Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[6] But, in order for website

---

[3] *See* US Privacy Policy, https://birdandbe.com/pages/us-privacy-policy.

[4] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Dec. 9, 2025).

[5] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Dec. 9, 2025).

[6]      *Welcome      to      Google      Analytics*,      GOOGLE,
*Footnote continued on next page*

CASE NO.:                                    PLAINTIFFS'
        CLASS ACTION COMPLAINT

operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[7]

38.    Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[8]

39.    Google also admits that it uses the information collected from third party websites, such as Defendant's, to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[9]

40.    Facebook operates the world's largest social media company, and the vast majority of its revenue comes from selling advertising space on its platform. In 2021, Facebook generated $117 billion, roughly 97% of which was derived from the sale of digital advertisements.[10]

41.    Facebook markets its Business Tools to website operators, claiming that its Business Tools can:

> [H]elp website owners and publishers, app developers, and business
> partners, including advertisers and others, integrate and share data with

https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Dec. 9, 2025).

[7] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Dec. 9, 2025).

[8] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last accessed Dec. 9, 2025).

[9] *Id.*

[10] *Meta Reports Fourth Quarter and Full Year 2021 Results*, META, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last accessed Dec. 9, 2025).

CASE NO.:                                                    PLAINTIFFS'
                                            12              CLASS ACTION COMPLAINT

Meta, understand and measure their products and services, and better reach and serve people who use or might be interested in their products and services.[11]

42.   But, like with Google, website operators using Facebook's Business Tools must install Facebook's Tracking Tools on their website. Facebook readily admits that it "receives information from [third-party] businesses and organizations," such as Defendant, and uses that information to sell targeted advertising.[12] By way of example, Facebook's online *Help Center* explains that users "may see [Facebook] ads for hotel deals if [they] visit travel websites."[13]

43.   While Google and Facebook admit that they collect information from third-party websites through the Tracking Tools, neither provides, nor could provide, a publicly available list of every webpage on which their Tracking Tools are installed. As such, the vague descriptions of Google and Facebook's data collection practices referenced above could not have given Plaintiffs and Class Members any reason to think that Defendant was part of Google and Facebook's surveillance network. Moreover, as Defendant does not disclose its use of Google and Facebook's Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of Google and Facebook's privacy statements in connection with their use of the Website.

44.   Google and Facebook aggregate the user information that they collect from third-party websites into 'advertising profiles' consisting of all of the data that they have collected about a given user.[14] With these advertising profiles, Google

---

[11]   *The Meta Business Tools*, FACEBOOK HELP CENTER, https://www.facebook.com/help/331509497253087?helpref=faq_content   (last accessed Dec. 9, 2025).

[12]   *How Meta receives information from other business and organizations*, FACEBOOK HELP CENTER, https://www.facebook.com/help/2230503797265156/?helpref=related_articles (last accessed Dec. 9, 2025).

[13]   *Id*.

[14]   Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive*

*Footnote continued on next page*

CASE NO.:                                          PLAINTIFFS'
CLASS ACTION COMPLAINT

and Facebook can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[15]

45.    Google and Facebook's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google [, and] Facebook[.]"[16] Google trackers are present on 74-percent of all web traffic, and 16-percent of websites have a hidden Facebook tracking Pixel.[17]

46.    Moreover, as in this case, the data collected by Google and Facebook often pertains to the most personal and sensitive aspects of an individual's life. For example:

    a.  93-percent of pornography websites allow third parties, including Google and Facebook, to collect their user's browsing habits.[18] In fact,

---

*Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[15] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last accessed Dec. 9, 2025); *Facebook Ads: Who You Can Target*, SEOM Interactive, https://searchenginesmarketer.com/company/resources/facebook-ads-can-target/ (last accessed Dec. 9, 2025).

[16] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Dec. 9, 2025).

[17] *WhoTracksMe*, Ghostery, https://www.ghostery.com/whotracksme/ (last accessed Dec. 9, 2025).

[18] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

CASE NO.:                                                   PLAINTIFFS'
                                        14        CLASS ACTION COMPLAINT

Google advertising trackers were found on 73-percent of pornography websites.[19]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[20]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[21] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google and Facebook.[22]

d. Thirty-three of the most popular crisis center websites provide information to Facebook through its Meta Pixel, including, in some cases, that users filled out a contact form or clicked a button to initiate a call to a suicide helpline.[23]

---

[19] *Id.*

[20] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[21] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Dec. 9, 2025).

[22] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Dec. 9, 2025).

[23] Colin Lechner & Jon Keegan, *Suicide Hotlines Promise Anonymity. Dozens of Their Websites Send Sensitive Data to Facebook*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/13/suicide-hotlines-promise-anonymity-dozens-of-their-websites-send-sensitive-data-to-facebook (last accessed Dec. 9, 2025).

47.   This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[24] Likewise, in 2008, Facebook CEO Mark Zuckerberg predicted that the amount of information shared by individuals online will likely double every year, and Facebook's best strategy is to be "pushing that forward."[25]

48.   In fact, Google and Facebook value user information so highly that they provide their Business Tools to many website operators for free, all to expand their surveillance apparatus.[26]

49.   When website operators, like Defendant, make use of Google and Facebook's Business Tools, they are essentially choosing to participate in Google and Facebook's mass surveillance network, and in return they benefit from Google and Facebook's collection of user data, at the expense of their website users' privacy. For example, in exchange for allowing it to collect user information, Facebook allows website operators to target customers with "dynamic advertisements" personalized to individual consumers using the user information that Facebook collects from all across the internet.[27] Likewise, Google rewards website operators for providing it with their user's information by granting access

[24] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Dec. 9, 2025).

[25] Michael Zimmer, *Mark Zuckerberg's Theory of Privacy,* THE WASHINGTON POST (Feb. 4, 2014), https://www.washingtonpost.com/lifestyle/style/mark-zuckerbergs-theory-of-privacy/2014/02/03/2c1d780a-8cea-11e3-95dd-36ff657a4dae_story.html (last accessed Dec. 9, 2025).

[26] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last accessed Dec. 9, 2025) ("Google Analytics gives you the tools, free of charge"); *Meta Business Suite FAQ*, META, https://www.facebook.com/business/tools/meta-business-suite/help (last accessed Dec. 9, 2025) ("Meta Business Suite is a free tool").

[27] *Retargeting*, META, https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last accessed Dec. 9, 2025).

CASE NO.:

16

PLAINTIFFS'
CLASS ACTION COMPLAINT

to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[28]

50.    In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[29] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[30]

51.    Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[31]

**B.    Pixels Can Record Almost Every Interaction Between a User and a Website**

52.    In order to use Google and Facebook's Business Tools, Defendant installed Google and Facebook's Tracking Tools, including tracking Pixels, onto its website.

53.    Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
> Pixel tracking can be monetized in several ways. One way to monetize

---

[28]    *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Dec. 9, 2025).

[29] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[30] *Id*.

[31] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POL. FOR THE INFO. SOC. (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

---

CASE NO.:                                        PLAINTIFFS'
                                        17        CLASS ACTION COMPLAINT

pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[32]

54.    Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the specific buttons and hyperlinks that the user clicks, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[33]

55.    But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[34]

**C.    Klaviyo's Mass Surveillance Operation.**

---

[32] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Dec. 9, 2025).

[33] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last accessed Dec. 9, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Dec. 9, 2025).

[34] *Lurking Beneath the Surface, supra* note 32.

CASE NO.:                                        PLAINTIFFS'
                                    18           CLASS ACTION COMPLAINT

56.    Klaviyo, Inc. ("Klaviyo") is a marketing automation platform that provides website operators with sophisticated tools for tracking, identifying, and monitoring website visitors. Klaviyo's web tracking system operates through JavaScript code implemented directly into website templates.[35]

57.    Klaviyo's "identify" feature "allows [website operators] to identify and set properties on an individual" as a means of specifically identifying and tracking that individual.[36]

58.    According to Klaviyo's own documentation, Klaviyo identifies site visitors for onsite tracking when:

    a. If someone has, at some point, clicked through a Klaviyo email or SMS to your website.

    b. If someone has, at some point, subscribed/opted-in through a Klaviyo form.

    c. If someone has, submitted a Klaviyo form through a certain action.[37]

59.    Klaviyo identifies users through a URL parameter designated "_kx." Klaviyo's documentation explains that its "email website tracking works by adding an additional parameter to all the URLs you send (i.e., the _kx parameter)."[38]

60.    Klaviyo tracking code deploys a persistent tracking cookie—identified as "__kla_id"—which "identif[ies] site visitors through an auto-generated ID" and stores this ID along with other personally identifiable information, including names

---

[35]*JavaScript API for Identification and Tracking*, Klaviyo Developers, https://developers.klaviyo.com/en/docs/javascript_api (last visited Nov. 26, 2025).

[36] *Id.*

[37] *Getting Started with Klaviyo Onsite Tracking*, https://help.klaviyo.com/hc/en-us/articles/115005076767 (last visited Nov. 26, 2025).

[38]*Id.*

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

19

and email addresses, gathered by Klaviyo tracking tools embedded elsewhere on the web.[39]

61.    Klaviyo also offers an "Extended ID", which "works by reading common deterministic identifiers (i.e., exact unique identifiers) stored in a user's browser."[40] These identifiers include "long-lasting, first-party unique identifiers (i.e. cookies) . . . created by other platforms for use cases such as analytics."[41]

62.    The Klaviyo tracking code also records user activity on websites. Klaviyo's feature library includes features like "track" and "trackViewedItem," which enable comprehensive behavioral surveillance.[42] The "track" method "allows you to record events and actions people take on your website," accepting "a string, which is the name you give to that event" along with "an optional dictionary or hash of properties associated with that event."[43]

63.    Klaviyo defines these tracked actions as "metrics," which "record actions that customers take on your website, in response to an email, or through any other data source where customer behavior takes place."[44] Klaviyo emphasizes that

---

[39]*Understanding Cookies in Klaviyo*, https://help.klaviyo.com/hc/en-us/articles/360034666712 (last visited Nov. 26, 2025).

[40] *Id.*

[41] *Id.*

[42]*Introduction to the Klaviyo Object*, https://developers.klaviyo.com/en/docs/introduction_to_the_klaviyo_object (last visited Nov. 26, 2025).

[43]*Track Website User Journeys With Klaviyo,* https://javascript.plainenglish.io/track-user-journey-and-send-highly-targeted-emails-with-klaviyo-7444746a5d76

[44]    *Track API Metrics with JavaScript*, KLAVIYO, www.developers.klaviyo.com/en/docs/custom_event_tracking (last visited Nov. 26, 2025).

CASE NO.:                                          PLAINTIFFS'
                                    20            CLASS ACTION COMPLAINT

its "metric tracking and analytics are very flexible" and can be "customize[d] . . . to keep track of what's important to your business."[45]

64.   Klaviyo lets website operators track page views, product interactions, form submissions, account creation, and other behavioral data.[46] When a website operator creates "a custom event object via API," they provide "a metric name associated with the event," and "[i]f the metric you provide does not match an existing one, a new metric will be created."[47]

65.   Klaviyo also enables website operators to capture and store anonymous browsing activity for later linkage to identified individuals. Klaviyo's "anonymous visitor activity backfill" feature allows website operators to "capture onsite activity for a shopper prior to identification." When that visitor is subsequently identified, "all events stored in the cookie will be pushed to Klaviyo for that profile," enabling retroactive construction of the user's complete browsing history.[48]

66.   All tracking data collected by the Klaviyo JavaScript snippet is transmitted to Klaviyo's servers. The Klaviyo platform and customer data are "hosted on AWS cloud infrastructure" in "AWS data centers located in the US."[49] Klaviyo's Privacy FAQs acknowledge that "Customer Personal Data" processed

---

[45] *Id.*

[46] *Set Up API-Based Website Activity Events*, KLAVIYO, www.developers.klaviyo.com/en/docs/guide_to_setting_up_api_based_website_activity_events (last visited Nov. 26, 2025).

[47] *Events API Overview*, KLAVIYO, www.developers.klaviyo.com/en/reference/events_api_overview (last visited Nov. 26, 2025).

[48] *Understanding Anonymous Visitor Activity Backfill*, KLAVIYO, www.help.klaviyo.com/hc/en-us/articles/17928628922395 (last visited Nov. 26, 2025).

[49] *Legal Terms & Policies*, KLAVIYO, www.klaviyo.com/legal (last visited Nov. 26, 2025).

through its platform "typically includes details such as the Customer end consumer's names, email addresses, phone numbers, IP addresses, and cookie data."[50]

67.    Klaviyo's sophisticated, cross-domain tracking technology allows them to create an "identity graph" which connects unsuspecting individuals to the assigned Klaviyo ID. Klaviyo thereby collects user identities alongside browsing histories, shopping habits, and other sensitive data, selling the resulting user profiles to advertisers.

**D.    The Pixels Installed on Defendant's Website Transmit Personally Identifiable Information to Google and Facebook**

68.    Every website is hosted by a computer "server" that holds the website's contents.

69.    To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

70.    Communications between a website server and web browser consists of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

---

[50] *Privacy FAQs*, KLAVIYO, www.klaviyo.com/legal/privacy-faqs (last visited Nov. 26, 2025).

CASE NO.:                                                                PLAINTIFFS'
                                                    22            CLASS ACTION COMPLAINT

71.     Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[51] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[52] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[53]

72.     When a Google/Facebook user logs onto their account, their web browser records a Google/Facebook tracking cookie.[54] These cookies include a specific line of code that links the web browser to the user's Google/Facebook account.[55]

73.     Google and Facebook's Pixels use cookies, but operate differently than cookies.  Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user. The information can include details about the user, his or her interactions with the Website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device).

74.     Simultaneously, the Google and Facebook Pixels, like those installed on Defendant's Website, request identifying information from any Google and Facebook cookies previously installed on the user's web browser.

75.     The Pixel then combines the data it received from the browser with the data it acquired from the cookie, and instructs the web browser to transmit the information back to Google and Facebook. As a result, Google and Facebook can

---

[51] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last accessed Dec. 9, 2025).

[52] *Id.*

[53] *Id.*

[54] Cyphers, *supra* note 14.

[55] *Id.*

CASE NO.:

23

PLAINTIFFS'
CLASS ACTION COMPLAINT

link all of the user information collected by their Pixels on the Defendant's Website to the user's identity, via the user's Google or Facebook profile. Thus, even if a user never actually logs into a website, or fills out a form, the website, along with Google and Facebook, can know the user's identity.

76. A remarkable number of Americans possess a Google or Facebook account. According to a 2023 survey, 68-percent of Americans report that they are users of Facebook.[56] And just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[57] When these users visit a website, like Defendant's, that utilizes a Google or Facebook Pixel, any information collected by the Pixel can be linked to the user's identity through the Google and Facebook cookies installed on the user's web browser.

77. However, it is not only Google and Facebook account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google and Facebook utilize sophisticated data tracking methods to identify even those few users who do not have a Google or Facebook account.

78. Google and Facebook's Pixels, like those on Defendant's website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

79. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[58] By tracking this browser fingerprint, Google and Facebook are able to

---

[56] Katherine Schaeffer, *5 facts about how Americans use Facebook, two decades after its launch*, PEW RESEARCH (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last accessed Dec. 9, 2025).

[57] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last accessed Dec. 9, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Dec. 9, 2025).

[58] Cyphers, *supra* note 14.

CASE NO.:                                                            PLAINTIFFS'
                                          24                CLASS ACTION COMPLAINT

compile a user's activity across the internet.[59] And, as Google and Facebook continuously compile user data over time, their understanding of the user's browser fingerprint becomes more sophisticated such that they need only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

**E.     Defendant Disclosed Plaintiffs' and Class Members' Sensitive Health Information to Google and Facebook**

80.     To take Defendant's online assessment or purchase its products, Plaintiffs and Class Members were required to use the Website.

81.     Unbeknownst to Plaintiffs and Class Members, Defendant intentionally configured the Google, Facebook and Klaviyo Pixels installed on its Website to capture and transmit the Sensitive Health Information that they communicated to Defendant while completing these online forms to at least seven unauthorized parties, including Google, Facebook, and Klaviyo.

82.     The below screenshots ("Figures 1 and 2") shows that when Website users complete Defendant's online assessment or purchase one of its products, the information requested and transmitted to Google by the Pixels installed on Defendant's website includes the specific medical information conveyed through that screening, and the specific product purchased by the user.

*[Remainder of page intentionally left blank]*

---

[59] *Id.*

CASE NO.:                                                          PLAINTIFFS'
                                            25                      CLASS ACTION COMPLAINT

83.    Further, the information transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiffs to their identities. The following screenshot shows that the Google Pixel on Defendant's website transmitted the identifier number attached to Google's '_cid' and '_sid' cookies, which identifies, and links the user's Website behavior to the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, operating system software and version number, and internet browser software and version number.

*Figures 1 and 2. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Google when Website users complete Defendant's Online Assessment and Purchase a Product.*

84.    The information transmitted to Klaviyo is even more invasive. As the screenshot below ("Figure 3") shows, when Website users take Defendant's online assessment, the Website transmits detailed medical information provided by the user along with their ***full name*** and ***e-mail address***.

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

```
URL
+ https://a.klaviyo.com/client/profiles/?company_id=SwpPMq

HEADERS
+ accept:            application/json
+ accept-encoding:   gzip, deflate, br, zstd
+ accept-language:   en-US,en;q=0.9
+ content-length:    753
+ content-type:      application/json
+ origin:            https://app.birdandbe.com
  priority:          u=1, i
+ referer:           https://app.birdandbe.com/
  revision:          2024-10-15
  sec-ch-ua:         "Not;A=Brand";v="99", "Microsoft Edge";v="139", "Chromium";v="139"
  sec-ch-ua-mobile:  ?0
  sec-ch-ua-platform: "Windows"
+ sec-fetch-dest:    empty
+ sec-fetch-mode:    cors
+ sec-fetch-site:    cross-site
+ user-agent:        Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko)
                     Chrome/139.0.0.0 Safari/537.36 Edg/139.0.0.0
  x-klaviyo-js-url:  query
  x-klaviyo-onsite:  1
```

753 bytes   JSON ∨ REQUEST BODY ∧

```
5    "first_name": "Charles",
6    "last_name": "Dragon",
7    "email": "siricharlestest@gmail.com",
8    "properties": {
9      "$referrer": {
10       "ts": 1755559599,
11       "value": "https://birdandbe.com/",
12       "first_page": "https://app.birdandbe.com/assessment"
13     },
14     "$last_referrer": {
15       "ts": 1755559674,
16       "value": "https://birdandbe.com/",
17       "first_page": "https://app.birdandbe.com/assessment"
18     },
19     "$exchange_id": "UDG_185fh7WcZOrxvGbUVwUz01FSCRePJqcyoilZAdgiBk171w39sl9OENf4uWvI.SwpPMq",
20     "bb_quiz_birthyear": 1987,
21     "bb_quiz_describes": "I am a person with sperm",
22     "bb_quiz_partner": "I have a partner with eggs",
23     "bb_quiz_journey": "trying",
24     "bb_quiz_trying": "1 to 2 years",
25     "bb_quiz_email": "siricharlestest@gmail.com",
26     "bb_quiz_diagnosis": [
27       "low ovarian",
28       "pregnancy loss",
29       "uterine issues"
```

*Figure 3. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Klaviyo when Website users complete Defendant's Online Assessment and Purchase a Product.*

85.    In their default state, Google and Klaviyo's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage.[60] Defendant purposely configured the Google and Klaviyo Pixels on its Website to collect and transmit additional user data, including the results of online evaluations.

---

[60] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on Nov. 22, 2025).

CASE NO.:                                          PLAINTIFFS'
                              28                   CLASS ACTION COMPLAINT

86. By installing third-party Tracking Tools, including tracking Pixels, on its Website, and by further configuring those Pixels to collect its Website user's Sensitive Health Information, Defendant knowingly and intentionally caused Plaintiffs's and Class Members' Sensitive Health Information to be transmitted to third parties, including Google, Facebook and Klaviyo.

**II. DEFENDANT DISCLOSED PLAINTIFFS'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT**

**A.     Defendant failed to inform Plaintiffs and Class Members of its disclosure of their Sensitive Health Information, in violation of its Privacy Policy**

87. Defendant breached Plaintiffs' and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google, Facebook and Klaviyo. Specifically, Plaintiffs and Class Members had a reasonable expectation of privacy (based on Defendant's own representations to Plaintiffs and the Class that Defendant would not disclose their Sensitive Health Information to third parties). Defendant did not inform Plaintiffs and Class Members that it was sharing their Sensitive Health Information with third parties, including Google, Facebook and Klaviyo.

88. By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, Defendant breached Plaintiffs' and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

89. Knowing just how invasive it can be when a user's Sensitive Health Information is disclosed without consent, Facebook explicitly stated, in an action pending against Facebook related to use of its Meta Pixel on a healthcare provider's Website, that it requires Facebook Pixel users to "post a prominent notice on every page where the pixel is embedded and to link from that notice to information about

exactly how the pixel works and what is being collected through it, so it is not invisible."[61]  Defendant did not abide by this policy.

90.    Despite never telling users like Plaintiffs and Class Members, Defendant allowed third parties such as Google, Facebook and Klaviyo to intercept Plaintiffs' and Class Members' Sensitive Health Information and use it for advertising purposes.

**B.     The Tracking Tools Used by Defendant Were Imperceptible to Plaintiffs and Class Members**

91.    The Tracking Tools installed on Defendant's Website were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by Defendant's Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs and Class Members, were unable to detect the Tracking Tools on Defendant's Website.

92.    Plaintiffs and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

93.    Plaintiffs and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

94.    Because Plaintiffs and Class Members were not aware of the Google, Facebook and Klaviyo Pixels on Defendant's website, or that their Sensitive Health Information would be collected and transmitted to Google, Facebook and Klaviyo, they could not and did not consent to Defendant's conduct.

---

[61] *See* Transcript of the argument on Plaintiff's Motion for Preliminary Injunction in *In re Meta Pixel Healthcare Litigation*, Case No. CV-22-03580-WHO (N.D. Cal. Nov. 9, 2022) (Hon. J. Orrick), at 19:12-18; *see also In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218 (N.D. Cal. Dec 22, 2022).

CASE NO.:                                          PLAINTIFFS'
                                    30             CLASS ACTION COMPLAINT

## III. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

### A.    Defendant Received Material Benefits in Exchange for Plaintiffs' Sensitive Health Information

95.    As explained, *supra*, users of Google, Facebook and Klaviyo's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google, Facebook and Klaviyo's Tracking Tools on their website.

96.    Upon information and belief, Defendant, as a user of Google, Facebook and Klaviyo's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google, Facebook and Klaviyo to collect Plaintiffs' and Class Members' Sensitive Health Information.

### B.    Plaintiffs' and Class Members' Data Had Financial Value

97.    Moreover, Plaintiffs' and Class Members' Sensitive Health Information had value, and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiffs and the Class.

98.    According to Facebook's annual reports, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[62]

99.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only

---

[62] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last accessed Dec. 9, 2025).

CASE NO.:                                    PLAINTIFFS'
                              31            CLASS ACTION COMPLAINT

due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

100.   Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

101.   Facebook itself has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between ages 13 and 35.

102.   The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

**IV. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA**

103.   The disclosure of Plaintiffs' and Class Members' Private Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[63]

104.   The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by a covered entity such as Defendant. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes Personal Health Information

---

[63] *The HIPAA Privacy Rule,* https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Mar. 7, 2025).

("PHI").[64]

105. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

106. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply ***not*** permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent.

107. Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA* Covered *Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule.

108. Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[65]

109. Under federal law, a healthcare provider may not disclose personally

---

[64] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Oct. 8, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

[65] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* HHS, *available online at*: https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html.

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

33

identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[66]

110.   Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

111.   The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

112.   IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

113.   Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account

---

[66]   HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

CASE NO.:                                        PLAINTIFFS'
                                   34            CLASS ACTION COMPLAINT

numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

114. The HIPAA Privacy Rule requires any "covered entity"—which includes proprietors of FSA/HSA-eligible medical products like Proov—to maintain appropriate safeguards to protect the privacy of protected health information, and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

115. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be Protected Health Information. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[67]

116. Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each

---

[67] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Mar. 7, 2025).

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

person on the list."[68]

117.   Here, Defendant provided protected health information to third parties in violation of the Privacy Rule.

118.   HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

119.   Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a.   Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b.   Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

c.   Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d.   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e.   Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f.   Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond

---

[68]   *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Mar. 7, 2025).

CASE NO.:                                      PLAINTIFFS'
                          36          CLASS ACTION COMPLAINT

using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g.    Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

120.    In its Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructed in 2012:

Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[69]

121.    In its Guidance regarding Marketing, HHS further instructed in 2003:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[70]

122.    HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule:

[69] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* (Nov. 26, 2012) at 5, available online at: https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/covereden tities/De-identification/hhs_deid_guidance.pdf.

[70]*Marketing*,                                                                                      HHS, https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/covereden tities/marketing.pdf  (April 3, 2003) (last visited Mar. 7, 2025).

CASE NO.:                                                    PLAINTIFFS'
                                        37          CLASS ACTION COMPLAINT

a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

123. In addition, the Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies.[71]

124. The Bulletin expressly provides that "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.**"[72]

125. Tracking technology vendors like Google are considered business associates under HIPAA where, as here, they provide services to receive and maintain PHI.

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the

---

[71] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 7, 2025).

[72] *Id.* (emphasis in original).

CASE NO.: 

38 

PLAINTIFFS'
CLASS ACTION COMPLAINT

Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[73]

126. The Bulletin further explained that health care providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

How do the HIPAA Rules apply to regulated entities' use of tracking technologies?

Regulated entities disclose a variety of information to tracking technology vendors through tracking technologies placed on a regulated entity's website or mobile app, including individually identifiable health information (IIHI) that the individual provides when they use regulated entities' websites or mobile apps. This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. **This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e. it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care**.[74]

127. HIPAA applies to Defendant's webpages with tracking technologies even outside the Website.

---

[73] *Id.*

[74] *Id.* (emphasis added).

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

39

Tracking on unauthenticated webpages

[T]racking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to tracking technology vendors. Examples of unauthenticated webpages where the HIPAA Rules apply include: The login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal **… [and pages] that address[] specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances**. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.[75]

128. HHS also explained in the Bulletin that tracking technologies on health care providers' patient portals "generally have access to PHI" and may access diagnoses and treatment information, in addition to other sensitive data:

Tracking on user-authenticated webpages

Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA

---

[75] *Id.* (emphasis added).

CASE NO.:

40

PLAINTIFFS' CLASS ACTION COMPLAINT

Security Rule.[76]

129. The Bulletin is not a pronouncement of new law, but instead a reminder to covered entities and business associates of their longstanding obligations under existing guidance.

130. The Bulletin notes that "it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors," then explains how online tracking technologies violate the same HIPAA rules that have existed for decades.[77]

131. In other words, HHS has expressly stated that Defendant has violated HIPAA Rules by implementing the Tracking Technologies.

**V. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY**

132. At all times when Plaintiffs and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose, unrelated to providing them with access to medical products.

133. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

---

[76] *Id.* (emphasis added).

[77] *Id.* (citing, *e.g.*, Modifications of the HIPAA [Rules], Final Rule," 78 FR 5566, 5598, a rulemaking notice from January 25, 2013, which stated: "[P]rotected health information … may not necessarily include diagnosis-specific information, such as information about the treatment of an individual, and may be limited to demographic or other information not indicative of the type of health care services provided to an individual. If the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected … in accordance with the HIPAA rules.").

CASE NO.:                                              PLAINTIFFS'
                                    41                CLASS ACTION COMPLAINT

134. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[78]

135. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[79] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[80]

136. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiffs and Class Members.

137. Plaintiffs relied on the statements made by Defendant, including in its Privacy Policy, when deciding to communicate their Sensitive Health Information to it through its Website.

## TOLLING AND ESTOPPEL

138. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Google, Facebook and Klaviyo's Tracking Tools into its Website.

---

[78] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last accessed Dec. 9, 2025).

[79] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[80] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

CASE NO.:                                                    PLAINTIFFS'
                                      42                     CLASS ACTION COMPLAINT

139.   The Pixels and other tracking tools on Defendant's Website were and are invisible to the average website visitor.

140.   Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

141.   Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

142.   Defendant had exclusive knowledge that its Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by purchasing a product, or completing Defendant's online evaluation through the Website, Plaintiffs' and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google, Facebook and Klaviyo.

143.   Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

144.   Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

145.   The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

CASE NO.:

43

PLAINTIFFS'
CLASS ACTION COMPLAINT

# CLASS ALLEGATIONS

146. This action is brought by the named Plaintiffs on their own behalves, and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

147. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**The Nationwide Class**

All natural persons who used Defendant's Website to take its online assessment or make a purchase, and whose Sensitive Health Information was disclosed or transmitted to Facebook, Google, Klaviyo, or any other unauthorized third party.

148. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of separate Pennsylvania and Maryland Subclasses, which are defined as follows:

**California Subclass**

All natural persons residing in California who used Defendant's Website to take its online assessment or make a purchase, and whose Sensitive Health Information was disclosed or transmitted to Facebook, Google, Klaviyo, or any other unauthorized third party.

**Pennsylvania Subclass**

All natural persons residing in Pennsylvania who used Defendant's Website to take its online assessment or make a purchase, and whose Sensitive Health Information was disclosed or transmitted to Facebook, Google, Klaviyo, or any other unauthorized third party.

**Maryland Subclass**

All natural persons residing in Maryland who used Defendant's Website to take its online assessment or make a purchase, and whose Sensitive Health Information was disclosed or transmitted to Facebook, Google, Klaviyo, or any other unauthorized third party.

CASE NO.:

44

PLAINTIFFS'
CLASS ACTION COMPLAINT

149.   Excluded from the proposed Classes are any claims for personal injury, wrongful death, or other property damage sustained by the Classes; and any Judge conducting any proceeding in this action and members of their immediate families.

150.   Plaintiffs reserve the right to amend the definitions of the Classes or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

151.   **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

152.   **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

    a)    Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiffs and Class Members;

    b)    Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiffs and Class Members to unauthorized third parties;

    c)    Whether Defendant violated its own privacy policy by disclosing the Sensitive Health Information of Plaintiffs and Class Members to third parties, including Google, Facebook and Klaviyo;

    d)    Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

    e)    Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Sensitive

CASE NO.:

45

PLAINTIFFS'
CLASS ACTION COMPLAINT

Health Information was being disclosed without their consent;

f)    Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

g)    Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

h)    Whether Defendant violated the statutes asserted as claims in this Complaint;

i)    Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j)    Whether Defendant knowingly made false representations as to their data security and/or privacy policy practices;

k)    Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

l)    Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

153.  **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

154.  **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.

CASE NO.:

46

PLAINTIFFS'
CLASS ACTION COMPLAINT

Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

155. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties like Google, Facebook and Klaviyo, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

156. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

157. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

158. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

CASE NO.:                              PLAINTIFFS'
CLASS ACTION COMPLAINT

a) Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c) Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

159. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

//

//

//

## COUNT I

## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT

## 18 U.S.C. § 2511(1), *et seq.*

### Unauthorized Interception, Use, and Disclosure

### (*On Behalf of Plaintiffs & the Nationwide Class*)

160. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

161. The ECPA protects both sending and receipt of communications.

162. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

163. The transmissions of Plaintiffs' Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

164. **Electronic Communications.** The transmission of Sensitive Health Information between Plaintiffs and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

165. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

166. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of

CASE NO.:                        PLAINTIFFS'

49             CLASS ACTION COMPLAINT

any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

167. **<u>Electronic, Mechanical, or Other Device</u>.** The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.   Plaintiffs' and Class Members' browsers;

b.   Plaintiffs' and Class Members' computing devices;

c.   Defendant's web-servers; and

d.   The code deployed by Defendant to effectuate the sending and acquisition of patient and Website user communications.

168. By utilizing and embedding the Pixels and Tracking Tools on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

169. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixels and Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Sensitive Health Information to third parties such as Google.

170. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Sensitive Health Information.

171. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

172. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

173. **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

174. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

175. Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Sensitive Health Information does not qualify for the party exemption.

176. Defendant's acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

   e.    Invasion of privacy;

   f.    Negligence;

   g.    Breach of confidence; and

   h.    Breach of fiduciary duty.

177. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including

Plaintiffs and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information, including IIHI, to Google without user authorization.

178. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Sensitive Health Information with Google and other third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving their Sensitive Health Information, and that Plaintiffs and Class Members did not consent to receive their Sensitive Health Information.

179. As such, Defendant cannot viably claim any exception to ECPA liability.

180. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

i. Learning that Defendant have intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

j. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiffs or Class Members;

k. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiffs or Class Members;

l. Defendant failed to provide Plaintiffs and Class Members with

the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

m.   The diminution in value of Plaintiffs' and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiffs and Class Members intended to remain private, no longer private.

181. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiffs' and Class Members' Sensitive Health Information for financial gain.

182. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

183. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

184. Any purported consent that Defendant may claim it received from Plaintiffs and Class Members was not valid.

185. In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

186. As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT  II

### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT

### Cal. Penal Code § 631

### *(On behalf of Plaintiff Eldridge & the California Class)*

187.   Plaintiff Eldridge (for the purposes of this count, "Plaintiff") repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

188.   Plaintiff Eldridge brings this claim under California law.

189.   The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

190.   CIPA begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code §§ 630

> California Penal Code § 631(a) provides, in pertinent part: Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so

CASE NO.:                                            PLAINTIFFS'
                                  54              CLASS ACTION COMPLAINT

obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)[.]

191. A defendant must show it had the consent of all parties to a communication.

192. At all relevant times, Defendant aided, employed, agreed with, and conspired with Google and other third parties to track and intercept Plaintiff's and California Subclass Members' internet communications while using the Website, specifically by installing and configuring the Pixel to intercept communication to permit Google to eavesdrop on and intercept in real-time the content of Plaintiff's and California Subclass Members' private communications with Defendant.

193. The content of those conversations included Private Information, such as highly sensitive PHI. Through Defendant's installation and configuration of the Pixels on its Web Properties, these communications were intercepted by Google during the communications and without the knowledge, authorization, or consent of Plaintiff and California Subclass Members.

194. Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff and California Subclass Members, transmitted the substance of their confidential communications with Defendants to a third party.

195. Defendant willingly facilitated Google's and other third parties' interception and collection of Plaintiff's and California Subclass Members' private medical information by embedding the Pixel(s) on the Website, thereby assisting Google's and other third parties' eavesdropping.

196. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Pixel falls under the broad catch-all category of "any other manner":

CASE NO.:                                                    PLAINTIFFS'
                                        55                   CLASS ACTION COMPLAINT

n.      The computer codes and programs Google and other third parties used to track Plaintiff's and California Subclass Members' communications while they were navigating the Website;

o.      Plaintiff's and California Subclass Members' browsers;

p.      Plaintiff's and California Subclass Members' computing and mobile devices;

q.      Google's web and ad servers;

r.      The web and ad servers from which Google and other third parties tracked and intercepted Plaintiff's and California Subclass Members' communications while they were using a web browser to access or navigate the Website;

s.      The computer codes and programs used by Google and other third parties to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a browser to visit the Website; and

t.      The plan Google and other third parties carried out to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a web browser or mobile application to visit the Website.

197. Defendant failed to disclose that it uses the Pixels to track and automatically and simultaneously transmit highly sensitive personal communications to a third party. Defendant is necessarily aware that these communications are confidential as its Website Privacy Policy acknowledges the confidential nature of PHI and disclaims that it is being shared with unidentified third parties without Plaintiff's and California Subclass Members' express authorization.

198. The patient communication information that Defendant transmits while using the Pixel and tracking technologies constitutes IIHI and PHI.

CASE NO.:                                          PLAINTIFFS'
                                    56          CLASS ACTION COMPLAINT

199.   As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties, including Google and its agents, employees, and contractors to receive its patients' online communications in real time through its Website without their consent. Google specifically receives the content of these communications and understands it, as the CID is assigned by Google and Google must understand the content in order to process it and link it to individual Users so that Google may target advertising to those persons based on their healthcare choices.

200.   By disclosing Plaintiff's and the California Subclass Members' private health information, Defendant violated Plaintiff's and California Subclass Members' statutorily protected right to privacy.

201.   As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiff and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

202.   Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT III

### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT

### Cal. Penal Code § 632

### *(On behalf of Plaintiff Eldridge & the California Class)*

203.   Plaintiff Eldridge (for the purposes of this count, "Plaintiff") repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if

fully set forth herein.

204. Plaintiff brings this claim under California law.

205. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

206. California Penal Code § 632(a) provides, in pertinent part:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation[.]

207. California Penal Code § 632(c) defines a "confidential communication" as:

> "Any communication carried on in circumstances as may reasonably indicate that any party to the communications desires to be confined to the parties thereto, but excludes a communication made … in any other circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

208. Courts routinely hold that internet communications can have sufficient confidential character to support a section 632 claim.

209. At all relevant times, Defendant aided, employed, agreed with, and conspired with Google and other third parties to record and eavesdrop upon Plaintiff's and California Subclass Members' confidential communications while using the Website, specifically by installing and configuring the Tracking Tools to permit Google to eavesdrop upon and record the content of Plaintiff's and California Subclass Members' confidential communications with Defendant.

210. The content of those conversations included Private Information, such

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

as highly sensitive PHI. Through Defendant's installation and configuration of the Tracking Tools on its Web Properties, these communications were intercepted by Google during the communications and without the knowledge, authorization, or consent of Plaintiff and California Subclass Members.

211. Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff and California Subclass Members, recorded and transmitted the substance of their confidential communications with Defendants to a third party.

212. Defendant willingly facilitated Google's and other third parties' interception and collection of Plaintiff's and California Subclass Members' private health information by embedding the Tracking Tools on the Website, thereby assisting Google's and other third parties' eavesdropping.

213. Plaintiff and California Subclass Members did not know of, and did not consent to, any recording or eavesdropping of these confidential communications.

214. The following items constitute "electronic amplifying or recording device to eavesdrop upon or record the confidential communication" under the CIPA:

    a. The computer codes and programs Google and other third parties used to track Plaintiff's and California Subclass Members' communications while they were navigating the Website;

    b. Plaintiff's and California Subclass Members' browsers;

    c. Plaintiff's and California Subclass Members' computing and mobile devices;

    d. Google's web and ad servers;

    e. The web and ad servers from which Google and other third parties tracked and intercepted Plaintiff's and California Subclass Members' communications while they were using a web browser

to access or navigate the Website;

f. The computer codes and programs used by Google and other third parties to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a browser to visit the Website; and

g. The plan Google and other third parties carried out to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a web browser or mobile application to visit the Website.

215. Defendant failed to disclose that it uses the Tracking Tools to track and automatically and simultaneously transmit highly sensitive personal communications to a third party. Defendant is necessarily aware that these communications are confidential as its Website Privacy Policy acknowledges the confidential nature of PHI and disclaims that it is being shared with unidentified third parties without Plaintiff's and California Subclass Members' express authorization.

216. The patient communication information that Defendant transmits while using the Tracking Tools constitutes IIHI and PHI.

217. As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties, including Google and its agents, employees, and contractors to receive its patients' online communications through its Website without their consent. Google specifically receives the content of these communications and understands it, as the CID is assigned by Google and Google must understand the content in order to process it and link it to individual Users so that Google may target advertising to those persons based on their healthcare choices.

218. By disclosing Plaintiff's and the California Subclass Members' private health information, Defendant violated Plaintiff's and California Subclass

Members' statutorily protected right to privacy.

219. The data collected by Defendant constituted "confidential communications" as that term is used in section 632, because California Plaintiffs and California Subclass members had objectively reasonable expectations of privacy in their devices and activity when communicating Sensitive Health Information to Defendant.

220. As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiff and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

221. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT IV

## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT

## Cal. Penal Code § 638.51(a)

### *(On behalf of Plaintiff Eldridge & the California Subclass)*

222. Plaintiff Eldridge (for the purposes of this count, "Plaintiff") repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

223. Plaintiff Eldridge brings this claim under California law.

224. Plaintiff Eldridge brings this claim in the alternative to, or in addition to, violations of Cal. Penal Code sections 631(a) and 632, which prohibit the interception of the contents of communications in transit. The section 638.51(a) claim is based solely on Defendant's capture of non-content signaling data, such as

IP addresses, unique identifiers, and routing metadata, regardless of whether content was also intercepted.

225.   CIPA is codified at California Penal Code sections 630–638. The Act begins with its statement of purpose in California Penal Code section 630:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

226.   CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

227.   A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

228.   The Tracking Tools are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"— the IP address and other device identifier information such as device type, browser type, unique cookie identifiers, session identifiers, referrer URLs, user-agent strings, clickstream paths, and timestamped navigation or submission data ("Device Metadata")—from the electronic communications transmitted by Plaintiff Eldridge's and the California Subclass members' computers, tablets or smartphones. Cal. Penal Code § 638.50(b).

229.   Likewise, the Tracking Tools are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the unique user identifiers associated with each Product from the electronic communications transmitted by Plaintiff Eldridge's and the California Subclass members' computers, tablets or

smartphones. Cal. Penal Code § 638.50(b). The unique IDs are "addressing" information because they are used to tie a Website user to third parties' databases and repositories of information about the user and ascertain the user's identity.

230. At all relevant times, Defendant installed the Tracking Tools—which include pen registers—on Plaintiff's and California Subclass members' browsers and used the Tracking Tools to collect Plaintiff's and California Subclass members' IP addresses and Device Metadata.

231. The Tracking Tools collect Plaintiff's and California Subclass members' IP addresses and Device Metadata independent of the contents it also collects of Plaintiff's and the California Subclass members' electronic communications with Defendant. See *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

232. Plaintiff Eldridge and California Subclass members did not provide their prior consent to Defendant's use of the Tracking Tools to collect their IP addresses and Device Metadata.

233. Defendant did not obtain a court order to install or use the Tracking Tools.

234. Defendant, in its conduct alleged here, was not providing an "electronic communication service" as that term is defined in 18 United States Code section 2510(12) and used in the Wiretap Act. Defendant was not acting as an Internet Service Provider.

235. Even if Defendant did qualify as an "electronic communication service" provider, (i) it did not install or use pen registers solely for the purpose of operating or protecting its own service, but instead used them for analytics, marketing, behavioral profiling, or unauthorized surveillance; and (ii) its deployment of pen registers in this context exceeds the narrow technical exception

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

63

set forth in § 638.51(b), as it permitted third parties (e.g., data analytics or tracking vendors) to receive, process, or store these intercepted signals without user consent or judicial oversight.

236. Defendant's use of the Tracking Tools to act as pen registers for the purpose of creating, and aiding third parties to create, valuable behavioral and advertising profiles about Plaintiff and California Subclass members without their consent constitutes a redressible concrete harm.

237. Pursuant to Cal. Penal Code section 637.2, Plaintiff and California Subclass members have been injured by Defendant's violations of CIPA section 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA section 638.51(a). Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

238. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT V

## VIOLATIONS OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT

### Cal. Civ. Code §§ 56, *et seq.*

### *(On behalf of Plaintiff Eldridge & the California Subclass)*

239. Plaintiff Eldridge (for the purposes of this count, "Plaintiff") repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

240. Plaintiff Eldridge brings this claim under California law.

241. The California Confidentiality of Medical Information Act, California Civil Code §§ 56, et seq. ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without patient authorization.

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

"Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual[.]" CAL. CIV. CODE § 56.05.

242. Defendant is a "provider of health care" as defined by California Civil Code § 56.06(b).

243. Plaintiff Eldridge and California Subclass Members are patients, and, as health care providers, Defendant had an ongoing obligation to comply with the CMIA's requirements. As set forth above, device identifiers, web URLs, Internet Protocol (IP) addresses, and other characteristics that can uniquely identify Plaintiff Eldridge and California Subclass Members are transmitted from within the State of California to Defendants in combination with patient medical conditions, medical concerns, treatment(s) sought by the patients, and doctors viewed along with the medical specialty of the doctor(s) searched for and viewed by patients. This is protected health information under the CMIA.

244. This private medical information is intercepted and transmitted within the State of California to third parties including Google and their agents, employees, and contactors via Defendant's knowing and intentional decision to embed enabling software into its Website.

245. CID is also an identifier sufficient to allow identification of an individual. Along with patients' CID, Defendant discloses to third parties including Google and its agents, employees, and contactors several pieces of information regarding patient use of its Website including but not limited to the following: patient medical conditions, medical concerns, treatment(s) sought by the patients, and medical specialty of the doctor(s) searched for by patients.

246. The information described above constitutes medical information

pursuant to the CMIA because it is patient information derived from a provider of health care regarding patients' medical treatment and physical condition, and this medical information is linked with individually identifying information. CAL. CIV. CODE § 56.05(i).

247. As demonstrated hereinabove, Defendant failed to obtain its patients' authorization for the disclosure of medical information and fails to disclose in their Website Privacy Policy that it shares Sensitive Health Information with Google or other third parties for marketing purposes.

248. Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must be: (1) "Clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) signed and dated by the patient or his representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, the information set forth in Defendant's Website Privacy Policy does not qualify as a valid authorization.

249. As described above, Defendant is violating the CMIA by disclosing its patients' medical information to third parties, including Google and their agents, employees, and contractors along with the patients' individually identifying information. Accordingly, Plaintiff and California Subclass Members seek all relief available for Defendant's CMIA violations.

250. Plaintiff and Class Members seek statutory damages, compensatory damages, punitive damages, attorney fees, and costs of litigation for Defendant's violation(s) of the CMIA.

## COUNT VI

### INVASION OF PRIVACY—CALIFORNIA CONSTITUTION

### ART. 1 § 1

***(On behalf of Plaintiff Eldridge & the California Subclass)***

251. Plaintiff Eldridge (for the purposes of this count, "Plaintiff") repeats the allegations contained the foregoing paragraphs as if fully set forth herein.

252. Plaintiff Eldridge brings this claim under California law.

253. Plaintiff Eldridge and California Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and California Subclass Members' knowledge or consent.

254. At all relevant times, by using Google's and other third parties' Tracking Tools to record and communicate patients' CIDs and other individually identifying information alongside their confidential medical communications, Defendant intentionally invaded Plaintiff Eldridge's and California Subclass Members' privacy rights under the California Constitution.

255. Plaintiff Eldridge and California Subclass Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential, and that Defendant would not install wiretaps on its Website to secretly transmit communications to a third party.

256. Plaintiff Eldridge and California Subclass Members did not authorize Defendant to record and transmit Plaintiff's and California Subclass Members' private medical communications alongside their personally identifiable health information.

257. This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

258. As a result of Defendant's actions, Plaintiff Eldridge and California Subclass Members have suffered harm and injury, including but not limited to an

invasion of their privacy rights.

259. Plaintiff Eldridge and California Subclass Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages and an injunction that prevents Defendant from engaging in the same or similar conduct in the future.

260. Plaintiff Eldridge and California Subclass Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff Eldridge and California Subclass Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiff Eldridge's and California Subclass Members' privacy.

261. Plaintiff Eldridge and California Subclass Members are further entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff Eldridge and California Subclass Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

262. Plaintiff Eldridge seeks all other relief as the Court may deem just, proper, and available for invasion of privacy under the California Constitution.

## COUNT VII

## COMMON LAW INVASION OF PRIVACY – INTRUSION UPON SECLUSION

### *(On Behalf of Plaintiffs & the Nationwide Class)*

263. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

264. Plaintiffs bring this claim under California law.

265. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal

activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiffs' and Class Members' knowledge or consent.

266. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

267. Plaintiffs and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

268. Defendants' interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

269. Plaintiffs and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

270. Defendant's disclosure and publicization of Plaintiffs' and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

271. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

272. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

273. Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

69

and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

274. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

275. Plaintiffs also seek such other relief as the Court may deem just and proper.

<u>**COUNT VIII**</u>

**NEGLIGENCE**

***(On Behalf of Plaintiffs & the Nationwide Class)***

276. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as if fully set forth herein.

277. Plaintiffs bring this claim under California law.

278. Through their use of the Website, Plaintiffs and Class Members provided Defendant with their Sensitive Health Information, believing such Information would be kept confidential.

279. By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

280. Defendant negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google.

281. Defendant further negligently omitted to inform Plaintiffs and Class Members that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

CASE NO.:

PLAINTIFFS'
CLASS ACTION COMPLAINT

282.   Defendant knew, or reasonably should have known, that Plaintiffs and Class Members would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

283.   Defendant's conduct has caused Plaintiffs and Class Members to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

284.   Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

285.   Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT IX

### UNJUST ENRICHMENT

### *(On Behalf of Plaintiffs & the Nationwide Class)*

286.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 211 as if fully set forth herein.

287.   Plaintiffs bring this claim under California law.

288.   Plaintiffs and Class Members conferred a monetary benefit on Defendant in exchange for healthcare services. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, supra.

289.   Defendant knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive

Health Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

290.   In particular, Defendant enriched itself by obtaining the inherent value of Plaintiffs' and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Sensitive Health Information.

291.   Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its patients' and potential patients' Sensitive Health Information.

292.   Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiffs' and Class Members' Sensitive Health Information.

293.   If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

294.   Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

295.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

296.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against Defendant as follows:

CASE NO.:

72

PLAINTIFFS' CLASS ACTION COMPLAINT

a.      an Order certifying the Nationwide Class and appointing the Plaintiffs and their Counsel to represent the Classes;

b.      equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiffs and Class Members;

c.      injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

d.      an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

e.      an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f.      prejudgment interest on all amounts awarded; and

g.      all such other and further relief as this Court may deem just and proper.

Dated: February 19, 2026          Respectfully Submitted,

By: */s/ Matthew J. Langley*
Matthew J. Langley (SBN 342846)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Ph: (773) 554-9354
E: matt@almeidalawgroup.com

Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd Suite 426
Long Beach, California 90802
Ph: (562) 534-5907

CASE NO.:                                    PLAINTIFFS'
                                    73    CLASS ACTION COMPLAINT

E: victor@almeidalawgroup.com

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ssingh@sirillp.com

*Counsel for Plaintiffs and the
Proposed Class*

*To be admitted Pro Hac Vice*